

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **PERRYVILLE GAS STORAGE, LLC** | **CIVIL ACTION 11-1883** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **DAWSON FARMS, LLC** | **MAG. JUDGE KAREN L. HAYES** |

## OPINION

This civil action was brought by Plaintiff Perryville Gas Storage, LLC ("Perryville"), on October 25, 2011, against Defendant Dawson Farms, LLC ("Dawson Farms").[1] Perryville, a natural gas company, sought condemnation of property belonging to Dawson Farms for the construction and maintenance of an interstate natural gas storage facility and associated facilities.

On December 1, 2011, subject to the parties' stipulated conditions, the Court entered an Order [Doc. No. 18], granting Perryville a preliminary and permanent injunction permitting it access to Dawson Farms' property to conduct surveying and other preparatory activities prior to May 1, 2012, and to commence construction-related activities beginning May 1, 2012. The parties reserved for trial, however, the damages or just compensation due to Dawson Farms.

A bench trial was held October 15-17, 2012. The parties made closing arguments, but waived the filing of post-trial briefs. The Court then took the matter under advisement.

The Court now enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as

---

[1] Perryville later filed an Amended Complaint [Doc. No. 42], adding LL Golson, Inc., as a Defendant. The Court will hold a separate bench trial to address damages due to that Defendant.

such.

I.  **FINDINGS OF FACT**

Perryville is a natural gas company as defined by the Natural Gas Act (the "Act"), 15 U.S.C. § 717(a)(6). On January 26, 2010, Perryville was issued a Certificate of Public Convenience and Necessity (the "Certificate")[2] by the Federal Energy Regulatory Commission ("FERC") to construct, own, operate, and maintain an interstate natural gas storage and associated facilities, including two natural gas pipelines (the "Project"), at the Crowville salt dome location in Franklin and Richland Parishes, Louisiana.

The Project crosses over and impacts two properties owned by Dawson Farms, which is in the business of growing, harvesting, curing, packing and marketing sweet potatoes. By letter dated July 7, 2010, Perryville's agent, Doyle Land Services, offered Dawson Farms $189,900.00 for the servitudes over Dawson Farms' two properties, known as the Magruder and Santiago fields. Dawson Farms declined the offer by letter dated July 19, 2010.

By letter dated October 6, 2011, Perryville notified Dawson Farms of its intent to file suit.

On October 25, 2011, Perryville filed a verified Complaint for condemnation under the Act and pursuant to Federal Rule of Civil Procedure 71.1. Perryville sought certain permanent and perpetual rights of way and servitudes, as well as temporary rights of way and servitudes for work space, across portions of the Magruder and Santiago fields, which were set forth in Exhibit 1 to Perryville's Complaint. Perryville also filed a Motion for Confirmation of Condemnation of Servitude and for Preliminary and Permanent Injunction Authorizing Immediate Entry [Doc. No. 5]. In the motion, Perryville requested the Court enter an order confirming that Perryville had the

---

[2]*See* [Doc. No. 1, Exh. 2].

substantive right to condemn and obtain immediate access to Dawson Farms' property.

On December 1, 2011, the case came for hearing on Perryville's motion. After a conference was held, the parties stipulated and agreed to the Court's granting of Perryville's motion, subject to the following conditions:

(1) Perryville Storage will post a bond in the amount of $3.9 million;

(2) Dawson Farms . . . withdraws its jury demand for a trial on compensation;

(3) A bench trial on compensation will be held on June 25, 2012, by the undersigned;

(4) At the bench trial, the Court will determine the amount of compensation for all damages associated with the 2012 crop year;

(5) At the conclusion of trial, based on the damages determined, the Court will assess the costs of the bond premium proportionately;

(6) Perryville Storage will notify Dawson Farms by a telephone call to its office during regular business hours at least 48 hours prior to entry onto Dawson Farms' property. If Perryville Storage is unable to reach a Dawson Farms representative at the telephone number provided, counsel for Perryville Storage will notify counsel for Dawson Farms by letter of its attempt to contact. One notice shall be sufficient if Perryville Storage will be on the property for more than one (1) day; however, if there is any break in activities on the property, Perryville Storage will give notice prior to returning to the property;

(7) If Perryville Storage's construction is not completed prior to the 2013 crop year, Dawson Farms reserves the right to file the appropriate motion for a second bench trial on damages for the 2013 crop year.

[Doc. No. 18]. Subject to these stipulations, the Court granted Perryville's requested preliminary and permanent injunctions. As part of the analysis in the December 1, 2011 Order, the Court concluded that Perryville had met its burden of demonstrating that natural gas producers and the public at large would be irreparably harmed if the Project was not in-service by December 31,

2012.³ Because of construction constraints resulting from the black bear denning season, Perryville had to access the Magruder and Santiago fields prior to May 1, 2012 to conduct surveying and preparatory activities and to commence construction activities. The Court's Order left for later determination the issues of compensation and proportionate assessment of the bond premium costs.

As required, on December 1, 2011, Perryville posted a bond in the amount of $3.9 million. The bond was filed with the Court on December 19, 2011.

The time constraints set forth in the Order required Perryville to construct the Project during the 2012 sweet potato crop cycle, which generally runs from May through November. In December 2011, Lev Dawson ("Dawson"), a member of Dawson Farms, determined that it would cost more than $3,063.00 per acre for a total in excess of $1.5 million to plant the sweet potato crop on the Magruder field, which is comprised of approximately 244 cultivatable acres, and the Santiago field, which is comprised of approximately 267 cultivatable acres. After consideration of the cost of planting and given the uncertainty of the damage from the Project, Dawson decided not to plant its sweet potato crop in the Magruder and Santiago fields and instead entered into a verbal lease agreement with David Cook, a farmer, approximately the week before Christmas. Cook leased the fields⁴ to plant corn and agreed to pay 20% of the gross revenue of the corn production to Dawson Farms.

Paul Lanham ("Lanham"), Perryville's Senior Vice President of Engineering and

---

³This was the negotiated in-service date with Perryville's customer, Centerpoint Energy, so that Centerpoint Energy could meet its contractual commitments.

⁴Cook also leased the Maxwell Field from Dawson Farms, but that field is not at issue in this lawsuit.

Operations, testified at trial that on December 23, 2011, Perryville was able to re-negotiate its contractual obligations with its key customer, Centerpoint Energy, to extend the in-service date to September 1, 2013. Perryville's other customers had already agreed to in-service dates of August and September 2013. Perryville did not seek to amend the Court's December 1, 2011 Order or notify Dawson Farms at that time.

On or about January 29, 2012, Cook had all 511 acres of the Magruder and Santiago fields treated with a mixture of Roundup and 2 4D, an herbicide used to "burn down" the fields prior to the planting of corn. 2 4D is not used as an herbicide in the production of sweet potatoes.[5]

Lanham notified Dawson's son, Seth Dawson, on January 30, 2012, that Perryville had re-negotiated the in-service date, permitting it to delay construction until after the 2012 sweet potato crop cycle. Seth Dawson did not inform Dawson of the call.[6]

Between early February and March 2, 2012, counsel for Perryville corresponded with counsel for Dawson Farms through email and by letter, to ensure that Dawson was aware that Perryville would delay its construction in order to allow Dawson Farms to plant its sweet potato crop. In reaching these factual determinations, the Court has not considered Perryville's Exhibit No. 19, and, consistent with the Court's ruling on the first day of trial, Perryville's oral motion on

---

[5] There was testimony from Perryville's rebuttal expert, Dr. John Boyd, that 2 4D would no longer have been in the ground by the time for planting sweet potatoes and, thus, could not have harmed the sweet potato crop. The Court need not reach this issue, however, because Dawson Farms had already leased the Magruder and Santiago fields to Cook before learning of Perryville's re-negotiated in-service date.

[6] Lanham and Dawson had previously met for settlement negotiations on January 27, 2012. The Court has not relied on any statements made in furtherance of settlement. However, even if Lanham effectively notified Dawson of Perryville's re-negotiated in-service date at that meeting, such notification would not change the Court's legal conclusions.

5

the third day of trial to admit the first paragraph of Exhibit No. 19 is DENIED.

Neither Dawson nor his counsel ever notified Perryville that the Magruder and Santiago fields had been leased to Cook, explaining only that Dawson was not comfortable proceeding because of his prior bad experiences with pipeline companies. Nevertheless, whether Dawson's decision was conveyed to Perryville or its counsel, Dawson had committed the Magruder and Santiago fields to Cook for planting corn in late December 2011 when he reasonably believed that Perryville would, consistent with the Court's December 1, 2011 Order, commence surveying and construction activities during the sweet potato crop cycle.

In early March, Cook planted corn on the Magruder and Santiago fields. The corn was harvested in August, and Cook paid Dawson Farms the portion due to it under the lease of $79,467.00.[7]

After the fields were planted in corn, Perryville began its surveying and construction activities in accordance with the servitudes and rights of way identified in the FERC certificate and on Exhibit 1[8] to the Court's December 1, 2011 Order.

James A. Young ("Young"), qualified by the Court as an expert in real estate appraisal, testified on behalf of Perryville on the taking of the servitudes and rights of way across the Magruder and Santiago fields. Young testified that the highest and best use of the lands taken was for agricultural purposes. He further testified as to comparable sales of land in the area. The

---

[7] Cook actually made two payments to Dawson Farms of $60,850.51 and $28,569.49, which were the amounts due for his lease of the Santiago, Magruder, and Maxwell fields. However, it is undisputed that $79,467.00 is the amount attributable to his lease of the Santiago and Magruder fields.

[8] Exhibit 1 also identifies the servitudes and rights of way over the Golson property.

Court finds his opinions to be relevant and reliable. Young arrived at a total value of $30,272.00 for the permanent and temporary servitudes and rights of way across Dawson Farms' properties. Young's opinion assumes that the fields were restored to the same condition in terms of slope, elevation, and the type of topsoil. In order to ensure that the fields were restored to the same condition, land leveling and drainage cleaning and soil restoration is necessary. The parties stipulated damages for land leveling and drainage cleaning are valued at $9,288.76, and damages for soil restoration are valued at $5,001.64.[9]

The Court also heard testimony from the experts for both parties about the 2012 sweet potato crop damages. Dr. Gerald Giesler ("Dr. Giesler"), a retired professor of economics at Louisiana State University, was qualified by the Court and testified for Perryville as an expert in the field of agricultural economics. Mike Martin ("Martin"), a certified public accountant, was qualified by the Court and testified for Dawson Farms as an expert in farm accounting. The Court found the testimony of both experts generally relevant, reliable, and credible.

The experts agreed that the considerations before the Court in rendering a damages award for the sweet potato crop were the number of acres affected, the yield, the costs of production, and pricing.

The Court finds that the number of acres affected is properly determined through the testimony of Dawson and his farm manager, Mark Knight ("Knight"). Dawson testified credibly that, but for Perryville's condemnation action, Dawson Farms would have planted a sweet potato crop on the Magruder and Santiago fields. With regard to the Santiago field, Dawson and Knight

---

[9] This estimate was provided Dr. Gerald Giesler, Perryville's expert, but Dawson Farms stipulated as to the amount of damages.

admitted that a portion of the field, totaling 100.2 acres, is always used for slip beds, planted in corn, and/or planted in experimental crops. Knight testified that for 2012 the 100.2 acres would have been planted in corn, regardless of Perryville's activities.

However, Dawson and Knight also testified, and the Court finds their testimony credible, that if sweet potatoes had been planted on the remaining acres of Santiago, almost all of the crop would have suffered damage from the Project because of irrigation and drainage problems. Dawson Farms uses pivot irrigation on Santiago, except for a very small field on the north serviced by furrow irrigation. Perryville's activities would have prevented proper irrigation of the sweet potatoes because the pivots could not cross over the construction. Additionally, sweet potatoes are very susceptible to high moisture, and, if water is not properly drained, the sweet potatoes will rot. Knight testified credibly that Perryville's activities would have affected drainage on all but one ditch on the Santiago field. Of the approximately 267 acres contained in the Santiago field, in total, 166.4 acres would have been affected by Perryville's activities.

The Magruder field is contained in Sections 11 and 12 of Township 16 North, Range 9 East, Franklin Parish, Louisiana. While Dawson Farms sought damages for the loss of the sweet potato crop in both sections, Dawson and Knight admitted that none of Section 12 was condemned. Dawson was aware that these acres were not included in the Court's December 1, 2011 condemnation order,[10] and Knight and Dawson admitted that the acres could have been

---

[10] Dawson testified that he did not know anything about Section 11 or Section 12, but his testimony is beside the point. The servitudes and rights of way condemned across his land were set forth in Exhibit 1 to the Court's December 1, 2011 Order. That Exhibit to the Court's Order identified the same servitudes and rights of way set forth in the FERC certificate. Whether or not Dawson trusts gas pipeline companies, he was reasonably charged with the knowledge of the limits of the Court's Order.

8

planted in sweet potatoes. Of the approximately 244 total acres in the Magruder field, in total, 112.8 acres were contained in Section 11 and would have been affected by Perryville's activities.

The Court relies on the testimony of Dr. Geisler, Martin, Dawson, and Knight with regard to yield. To reach a proper determination, the Court considered testimony on the sweet potato harvesting process. Typically, sweet potato farmers dig test samples and then begin harvesting when it appears that they have 60% so-called number 1s, which are much more profitable, than the other grade of sweet potatoes, known as jumbos (or number 2s). Field workers grade the sweet potatoes as they are harvested by a mechanical digger to determine whether they are number 1s or jumbos. Dawson Farms uses a four row digger, which is a mechanical, hydraulic harvester pulled behind a tractor. The sweet potatoes travel on a belted chain up the digger and are then rolled onto another belt. Four workers per row grade the sweet potatoes. The sweet potatoes then go to the back of the digger where they are graded again by three more workers. The results of the field-grading process are listed on daily digging reports.

After field grading is completed, the number 1s are taken to the curing shed or storage facility, and the jumbos are sent to canneries or other commercial facilities. After curing, the field-graded number 1s are sent across a packing line and again graded. If the cured sweet potatoes are again graded number 1s, they are known as "pack outs." If the cured sweet potatoes do not meet the criteria for number 1s, they are known as "wash outs" and are, like the field-graded jumbos, sent to canneries or commercial facilities. In the sweet potato industry, typically 60-65% of the field-graded number 1s are actually packed out as number 1s. However, the Court finds Dawson's testimony credible that Dawson Farms' two-step field-grading process is much more efficient and accurate than the typical field-grading process and results in a 75% pack out

rate.[11]

Because the sweet potato crop was not planted on the Magruder and Santiago fields in 2012, the Court must make a reasonable estimate of the yield that would have been produced on those fields. Dr. Giesler and Mr. Martin disagreed about the most accurate way to reach this determination. The Court agrees with and accepts Dr. Giesler's testimony that the best evidence of the production of a particular sweet potato field is the historical data for that field, rather than Mr. Martin's opinion that the Court should use the 2012 production numbers for Dawson Farms' Hermitage field. Although Dawson, Knight, and Martin also testified credibly that the Hermitage field is very similar to the Magruder and Santiago fields, as Dr. Giesler pointed out, the historical data shows that, despite the similarity of the fields, the Hermitage has consistently had greater yields than any of Dawson Farms' other fields.

On the Santiago field, there is a five-year historical average yield of 192.4 bushels of number 1s per acre and 122.5 bushels of jumbos per acre. On the Magruder field, there is a five-year historical average yield of 303.2 bushels of number 1s per acre and 98.25 bushels of jumbos per acre.

The Court does not entirely reject Martin's contention that the 2012 production numbers should be considered by the Court or that the Hermitage field is the most similar to the Magruder and Santiago fields. Martin testified that 2012 was a particularly good crop year for a number of crops, including sweet potatoes. From a review of the daily digging reports for 2012 and the historical data for five previous years, the Court found that there was a general increase in yield in

---

[11]In reaching this determination, the Court has not credited Martin's testimony that Dawson Farms had a 95% pack out rate, based on his personal observations while consulting on another lawsuit.

10

2012, but the percentage varied from field to field. Additionally, not all the fields have been in production for the entire five years. The Hermitage field, which was in production for the past five years, had a 14.22% increase in 2012 over its five-year historical yield. Giving consideration to the increased production in 2012, reviewing the data on all the fields, and, particularly, the increase on the Hermitage field, the Court has determined that the appropriate yield for the Magruder and Santiago fields should be 10% greater than the five-year historical yield for each field.

Dr. Giesler and Martin testified similarly about the costs of sweet potato production. The Court finds their testimony credible, but the Court finds it more appropriate to rely on Martin's estimate. As he noted in his testimony, Dr. Giesler had added the costs of storage, but Dawson Farms has its own storage facilities. The Court finds that the costs of production in 2012 would have been $3,304.15 per acre.

Dr. Giesler and Martin also testified similarly about the pricing of sweet potatoes. The Court accepts the testimony of Martin that sweet potatoes sold for $16 per carton in 2012. The parties agreed that jumbos sold for $0.1255 per pound.

In addition to the sweet potato crop damages, the parties stipulated that Dawson Farms is entitled to recover damages to the corn crop on 8.7317 acres at $497.08 per acre.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

Because this is an eminent domain action under the Act and the amount claimed by Dawson Farms as compensation for the condemned property exceeds $3,000.00, the Court has

subject matter jurisdiction under 15 U.S.C. § 717f(h).[12] The Court also has jurisdiction under 28 U.S.C. § 1337 because this action arises under an Act of Congress regulating interstate commerce, and under 28 U.S.C. § 1331 because this action also arises under the laws of the United States. Pursuant to 28 U.S.C. §1391(a), (b)(2), venue is proper in the Western District of Louisiana, because the condemned property is located within its bounds.

### B. Compensation for Condemnation of Property

#### 1. Fair Market Value of the Servitudes and Rights of Way

Under the Takings Clause of the Fifth Amendment to the United States Constitution, private property may not be taken for public purpose without "just compensation." U.S. CONST. amend. V. At trial, the landowner bears the burden of establishing value or the compensation due him, and whether he has carried that burden is a question for the trier of fact. *United States ex rel T.V.A. v. Powelson*, 319 U.S. 266, 273-74 (1943).

Just compensation generally refers to the fair market value of the property. *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984). The Supreme Court has further explained that

---

[12]Section 717f(h) provides:

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided*, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

12

"[j]ust compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined." *Olson v. United States*, 292 U.S. 246, 255 (1934). The landowner "must be made whole but is not entitled to more." *Id.*

> Market value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>
> (1)   Buyer and seller are typically motivated;.
>
> (2)   Both parties are well informed or well advised, and acting in what they consider their own best interests;
>
> (3)   A reasonable time is allowed for exposure in the open market;
>
> (4)   Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
>
> (5)   The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

12 C.F.R. § 34.42(g). In determining fair market value, courts look to actual comparable sales on the open market between willing buyers and sellers, giving consideration to the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. *See Kimball Laundry Co. v. United States*, 338 U.S. 1, 6 (1949); *Olson*, 292 U.S. at 255; *United States v. 320.0 Acres of Land, More or Less*, 605 F.2d 781 n.23 (5th Cir. 1979).

The Court determines that the fair market value of Perryville's permanent and temporary servitudes and rights of way across Dawson Farms' properties is $30,272, and Dawson Farms is

entitled to an award of this amount as just compensation for the taking.

### 2. Other Damages

Although the meaning of just compensation and fair market value are defined under federal law, the United States Court of Appeals for the Fifth Circuit has determined that Louisiana law controls when determining issues related to just compensation in condemnation or expropriation proceedings. *See Miss. River Transmission Corp. v. Tabor*, 757 F.2d 662, 665 n.3, 676 (5th Cir. 1985) ("15 U.S.C. § 717f(h) requires that the practice and procedure in federal expropriation proceedings conform as nearly as possible with the practice and procedure to be followed in a state court action in the state where the property being expropriated is situated . . . . Therefore, Louisiana law controls the issues in this case.").

The Louisiana Constitution provides that the owner of condemned property "shall be compensated to the full extent of his loss . . . [including] the appraised value of the property and all costs of relocation, inconvenience, and any other damages actually incurred by the owner because of the expropriation" or condemnation. LA. CONST. art. 1, § 4.

However, under Louisiana law, an injured party has a corresponding duty to mitigate damages. *Unverzagt v. Young Builders, Inc.*, 215 So.2d 823, 825 (La. 1968). This duty extends to a landowner in a condemnation action; when an expropriation or condemnation action "disrupts a business, the business has a duty to mitigate its damages." *State, Dept. of Transp. and Dev. v. G & B Oil Prods., Inc.*, 762 So.2d 1123, 1127 (La. Ct. App. 3 Cir. 2000); *see also Humble Pipe Line Co. V. Wm. T. Burton Ins., Inc.*, 221 So.2d 526, 528-29 (La. Ct. App. 1 Cir. 1969). Mitigation of damages, which is also known as the doctrine of avoidable consequences, requires that a party exercise reasonable diligence and care of a person of ordinary prudence. *Id.*; *see also Jacobs as*

14

*Tutor of Jacobs v. New Orleans Pub. Serv., Inc.*, 432 So.2d 843, 846 (La. 1983). The determination of reasonable care is an issue of fact based upon the circumstances of a particular case. *See Gray & Co., Inc. v. State ex rel. Dept. of Transp., Office of Highways,* 2011 WL 3243103, at *6 (La. Ct. App. 1 Cir. 2011); *see generally George v. Reliance Ins. Co.*, 819 So.2d 453, 455 (La. Ct. App. 3 Cir. 2002).

The Court determines that Dawson Farms reasonably mitigated its damages, based on the facts available to it, by leasing those portions of the Magruder and Santiago fields which it reasonably anticipated would be affected by Perryville's activities. Thus, Dawson Farms is entitled to recover a portion of the sweet potato crop damages.

The Court finds that, based on the drainage and irrigation issues, Dawson Farms was reasonable in leasing the Santiago field to Cook for the planting of corn. The Court has considered that a small, approximately 20-acre plot might have been planted in sweet potatoes, but, under the circumstances, it was not an unreasonable failure to mitigate for Dawson Farms to lease the entire field to Cook. Excluding the 100.2 acres which would have been planted in corn in 2012 anyway, Dawson Farms is entitled to recover sweet potato crop damages on 166.4 acres.

The Court further determines that Dawson Farms reasonably mitigated its damages by leasing those portions of the Magruder Field in Section 11, totaling 112.8 acres, to Cook. Dawson Farms unreasonably failed to mitigate its damages by leasing those portions of the Magruder field in Section 12, which would not have been affected by Perryville's activities. Dawson Farms cannot recover sweet potato crop damages for these acres. Thus, Dawson Farms is entitled to recover sweet potato crop damages on 166.4 acres.

In total, applying the factual determinations set forth above, the Court found that Dawson

Farms could have sold their 2012 sweet potato crop on Santiago for $724,194.43, and its crop on Magruder for $699,840.53. The Court then reduced that total amount by costs of production of $922,518.68 and the amount of the lease payment from Cook in the amount of $79,467.00. Thus, Dawson Farms is entitled to a total sweet potato crop damages award in the amount of $422,049.28.

In addition, the Court finds that Dawson Farms is entitled to an award of damages for land leveling and drainage cleaning in the amount of $9,288.76 and for soil restoration in the amount of $5,001.64, respectively.

Finally, as stipulated by the parties, Dawson Farms is also entitled to damages on 8.7317 acres of its corn crop at $497.08 per acre for a total of $4,340.35.

In total, after costs and offsets, the Court awards Dawson Farms other damages, in addition to the taking, in the amount of $440,680.03.

### III.  CONCLUSION

For the foregoing reasons, that Judgment shall be entered in favor of Dawson Farms and against Perryville in the total amount of $470,952.03. The Court will consider Perryville's Motion for Proportionate Assessment of Cost of Bond Premium [Doc. No. 78] separately. Within fourteen (14) days of the date of this Ruling, Perryville must file a supplemental memorandum and supporting evidence of the amount it claims Dawson Farms is required to pay as a proportionate assessment. Dawson Farms will have fourteen (14) days from the date Perryville's

supplemental memorandum is filed to file an opposition memorandum and any evidence.

MONROE, LOUISIANA, this  13  day of  November , 2012.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE